UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 17 CR 297 |
| v. | Judge Sara L. Ellis |
| BEENA PATEL | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

| | |
|---|---|
| FOREPERSON: | Do you solemnly swear or affirm that the testimony you are about to give is the truth, the whole truth, and nothing but the truth, so help you God? |
| WITNESS: | I do. |

—Oath, Sworn to before the Grand Jury by Defendant Beena Patel on October 15, 2015, and July 14, 2016

On two separate occasions, defendant Beena Patel, after swearing to that oath to tell the truth, lied repeatedly to a federal grand jury. In doing so, she successfully threw a wrench in the wheels of justice and ground them to a halt. Defendant was called before the grand jury to provide testimony related to allegations that individuals were purchasing jobs and promotions at the Circuit Court of Cook County Clerk's Office. Rather than testify truthfully and assist the grand jury in this portion of its investigation, defendant chose to willfully obstruct it by lying. Defendant not only had answers to the questions the grand jury was asking, but had information that went to the very heart of its investigation when it was examining why a job applicant to the Clerk's Office paid $15,000 in cash to the Clerk of Court: defendant had critical information that was at the crux of the grand jury's investigation because defendant was not only aware of the bribe payment, she had herself brokered it.

As described below and established at trial, in August 2014 Sivasubramani Rajaram gave $15,000 to Goat Masters, a business owned by the Clerk of the Circuit Court of Cook County and her husband. In exchange, Rajaram was rehired at the Clerk's Office. Defendant herself orchestrated this bribe, and then lied about it. Defendant was an active participant in Cook County's seminal problem of "pay-to-play" corruption, and she took active measures to cover up that corruption when she lied. Yet even now, after a jury convicted defendant on all three counts of the indictment, defendant still refuses to accept responsibility for her actions. Despite sitting through her own trial, defendant preposterously states in her version of the offense that she "is without information as to what effect [ ] her false statements had on the grand jury's ability to understand the dynamic of what was going on, and to what extent her false testimony prevented the government from proceeding with prosecutions." As a result of defendant's crimes, and her continued unwillingness to accept responsibility for those crimes, the government seeks a within-guidelines sentence of 30 months' imprisonment.[1]

## I.   BACKGROUND

### A. The Grand Jury Investigation of the Clerk of the Circuit Court of Cook County.

In light of defendant's decision to proceed to trial, the following is a summary of the grand jury's investigation prior to defendant's first appearance on October 15,

---

[1] Probation has calculated defendant's advisory Guidelines range to be 30 to 37 months' imprisonment. The government's Guidelines calculation is lower, detailed below, resulting in an advisory Guidelines range of 24 to 30 months' imprisonment.

2

2015, set forth to address the materiality of defendant's lies.

In the summer and fall of 2015, the Federal Bureau of Investigation, federal prosecutors, and the grand jury were well over a year into a grand jury investigation that included allegations that jobs, promotions, and pay raises within the Office of the Clerk of the Circuit Court of Cook County were being exchanged for certain benefits, including money and loans to the Clerk, her campaign, or to businesses owned by the Clerk and her husband.

Up until late August 2016, defendant worked in the Clerk's Office for almost thirty years and most recently held the title of Associate Clerk, earning approximately $110,000 per year.

Prior to defendant's first appearance before the grand jury on October 15, 2015, one aspect of the government's investigation was centered on the conduct of two Clerk's Office employees, one of whom was Rajaram. The FBI had information that Rajaram may have loaned $15,000 to Goat Masters Corporation, a company with ties to the Clerk and her husband, and that just weeks after those two financial transactions, Rajaram was hired at the Clerk's Office. Less than a year after those payments, Rajaram received a promotion in the Clerk's Office. On October 1, 2015, Rajaram testified before the grand jury and lied about various topics, including the nature of a payment he made to the Clerk, which payment was brokered by the defendant.

The investigation's second person of interest was Clerk's Office employee, Pinal Patel, who has no relation to defendant. The FBI had information that Pinal Patel's


brother had made two $5000 contributions to the Clerk's campaign, and, shortly after each of those contributions to the campaign, Pinal Patel received promotions in the Clerk's Office.

### B. Defendant Lies to the Grand Jury in Two Separate Appearances on Multiple Topics.

It is against this backdrop that the defendant first appeared before the grand jury on October 15, 2015. The FBI subpoenaed defendant to testify before the grand jury to determine whether the defendant could shed any light on these two people of interest—specifically, what information defendant had regarding Rajaram and Pinal Patel's employment and promotion history with the Clerk's Office, and whether their history had any relation to payments that they or their family members made to the Clerk's campaign or the Clerk's personal business. The FBI subpoenaed defendant to testify before the grand jury on a second occasion, on July 14, 2016, to address these same issues, and to confront defendant with additional information acquired during the course of the investigation, including information which was obtained from judicially authorized searches of cell phones belonging to defendant, Rajaram, and the Clerk.

On each occasion when the defendant testified in front of the grand jury, she took an oath swearing or affirming to tell the truth. After taking that oath, on both occasions, the defendant was advised that lying under oath was a crime with serious consequences. On both occasions, defendant was also advised that she could stop the

proceeding at any time should she wish to consult with her attorney, who was seated outside the grand jury room.

As set forth in the indictment, defendant lied about three topics that were of interest to the grand jury: 1) her knowledge of Rajaram's contacts with law enforcement and grand jury testimony, as well as her own contacts with Rajaram; 2) her knowledge of ticket sales to campaign fundraisers by Clerk's office employees, including herself; and 3) her contacts with Wasiu Fashina (the Clerk's Chief of Staff) and Pinal Patel. The third topic was relevant after investigators uncovered evidence that defendant recommended to Fashina that Pinal Patel be promoted because Pinal Patel and her brother done a lot for the Clerk's Office (as demonstrated at trial, Pinal Patel's brother had made $10,000 in campaign contributions to the Clerk). On April 26, 2019, a jury convicted defendant on all three counts of the indictment, finding that the defendant knowingly made material false statements before the grand jury during both of her appearances.

### C. The Materiality of Defendant's Lies.

As explained at trial, each group of lies was material. With respect to Rajaram, the grand jury was investigating whether the $15,000 that Rajaram gave to the Clerk several weeks before being hired at the Clerk's office constituted a bribe. Defendant's lies on each of these topics mattered, and affected the course of the grand jury's investigation. For example, after a round of questioning in which she continually attempted to obfuscate the truth, defendant was eventually forced to admit that she was present at the Corner Bakery when Rajaram handed over a $5,000 cash payment.

5

Her knowledge of that payment, and the circumstances surrounding it, went to the very heart of what the grand jury was investigating with respect to Rajaram's suspected bribe payment.

With respect to ticket sales, the grand jury was investigating whether employees were receiving promotions, raises, or other benefits in exchange for raising money for the Clerk. Defendant was asked several times, and in several ways, whether she was involved in selling tickets or knew of other employees at the Clerk's Office who sold tickets. She unequivocally denied any knowledge of these matters. That was proven to be a lie at trial after multiple witnesses—and defendant's own forensically recovered text messages—clearly established that defendant was not only aware of employees selling tickets within the Clerk's Office, but that she herself sold tickets, collected money from other employees from ticket sales, and organized fundraisers. As Special Agent O'Leary explained at trial, in a pay-to-play investigation, whether employees were receiving benefits in exchange for raising money for the Clerk was a topic of interest to the grand jury, and defendant's lies on that topic were material.

A third aspect of the investigation was whether Pinal Patel's brother had paid bribes in exchange for Pinal Patel's promotions. Defendant herself drew a connection between Pinal Patel's brother's donations and Pinal Patel's job prospects when she recommended in a text message to the Clerk's Chief of Staff that Pinal Patel be promoted because her brother had done a lot for the Clerk's Office. Again, defendant's lies on this topic were clearly material, and were designed to impede the investigation

6

of corruption at the Clerk's Office.

## II. SENTENCING GUIDELINES CALCULATION

The government's guidelines calculation does not include two points for a multiple count adjustment,[2] resulting in an adjusted offense level of 17 and a Guidelines range of 24 to 30 months' imprisonment. Otherwise, the government agrees with Probation's guidelines calculation, specifically the application of Guideline §2J1.3(b)(2) and that defendant does not receive credit for acceptance of responsibility, as follows.

First, contrary to defendant's objection, Probation's application of Guideline §2J1.3(b)(2) is appropriate given the impact that defendant's lies had on the government's investigation of job buying in the Clerk's Office and the government's ability to bring charges against those involved in this illegal activity—and the unnecessary expenditure of governmental and court resources. *See* PSR at ¶33. According to the Application Notes to Guideline §2J1.3(b)(2):

> "***Substantial interference with the administration of justice***" includes a premature or improper termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources.

---

[2]The PSR calculates the adjusted offense level as 19 and a Guidelines range of 30 to 37 months' imprisonment. PSR at ¶44. To arrive at that offense level, Probation applied a two-point multiple count adjustment, finding that defendant's two appearances before the grand jury constituted separate proceedings pursuant to Guideline §2J1.3(d)(1). PSR at ¶¶38-40. The government agrees with defendant that the multiple counts of conviction are grouped *together* for purposes of Guideline §3D1.2 because, pursuant to Application Note 5 of Guideline §2J1.3(d)(1), multiple grand jury proceedings do not constitute "separate proceedings."

7

U.S.S.G. §2J1.3(b)(2), Application Note 1. Both the first and third examples of this Application Note apply to defendant's conduct. First, because of defendant's lies to the grand jury—which extended beyond the Indictment and made it impossible for the grand jurors to distinguish between defendant's lies and later-extracted truthful information—and resulting perjury conviction, defendant compromised herself and the government's ability to use her as a testifying witness in any future proceeding of those involved in buying and selling jobs and promotions in the Clerk's Office. As a result, defendant's lies directly impacted the government's ability to charge those most culpable in the illegal activity.[3]

In addition, defendant's perjury resulted in the unnecessary expenditure of substantial government and court resources, resulting from: defendant's trial; the need to put defendant, Pinal Patel, and others before the grand jury multiple times; and the need for the government to obtain search warrants and subpoenas and conduct additional witness interviews. Such additional investigative steps were necessary to attempt to ferret out defendant's lies from the truth, and to attempt to determine what really was occurring within the Clerk's Office in light of the defendant's improbable grand jury testimony. Accordingly, the three-point

---

[3] The government would note that defendant had the ability to assert her Fifth Amendment privilege against self-incrimination, and was advised by the government of her right to do so. Had she exercised that right, the government would have had other options available to secure her truthful testimony, such as immunizing her. Instead, the defendant intentionally led the government astray on multiple topics in two separate grand jury appearances. In a case such as this, where defendant had firsthand knowledge of a bribe payment, defendant's lies had a significant negative impact on the government's investigation.

8

enhancement pursuant to Guideline §2J1.3(b)(2) is appropriately applied here. *See United States v. O'Neill*, 116 F.3d 245, 250 (7th Cir. 1997) (affirming district court's application of Guideline §2J1.3(b)(2) resulting from unnecessary expenditure of government or court resources based on government's need to look elsewhere for evidence it had sought from defendant: "O'Neill submits that his sentence cannot be enhanced for forcing the government to expend additional resources because he was merely asked to corroborate information the government already possessed, rather than to furnish 'new' information the government did not already possess. This argument is meritless. Regardless of whether the government was seeking new facts or verification of facts it already possessed, O'Neill's lies forced the government to look elsewhere for the information it sought, thereby expending additional resources."); *United States v. Atkin*, 29 F.3d 267, 269-70 (7th Cir. 1994) (affirming district court's application of Guideline §2J1.3(b)(2) to perjury conviction where defendant's lies to grand jury resulted in government's presentation of five additional witnesses before grand jury, including one that had to be flown in from Texas, constituting unnecessary expenditure of substantial government or court resources);[4]

---

[4] In *Atkin*, the Seventh Circuit affirmed the lower court's holding based solely on the prosecutor's statements to Probation with respect to the resources which were extended as a result of defendant's lies. 29 F.3d at 269. In this case, and contrary to defendant's statements in her sentencing memorandum that the only support for this enhancement stems from "conclusory" statements to Probation by the case agent and prosecutors, the evidence at defendant's trial supports the proper application of Guideline §2J1.3(b)(2). For example, the trial evidence included the testimony of multiple witnesses who testified about appearing before the grand jury (some on multiple occasions, for example, Pinal Patel) and being interviewed by federal law enforcement, as well as the admission of text messages resulting from searches of the various cell phones.

9

*United States v. Bradach*, 949 F.2d 1461, 1463 (7th Cir. 1991) (affirming district court's finding of proper application of Guideline §2J1.3(b)(2) in light of unnecessary expenditure of government resources including impairing the grand jury's proceedings and four perjury-related trials); *United States v. Lueddeke*, 908 F.2d 230, 234-35 (7th Cir. 1990) (affirming application of Guideline §2J1.3(b)(2), resulting from unnecessary expenditure of government resources, where FBI agents spent two weeks sorting out the truth following defendant's initial perjury).

Probation is also correct that defendant does not receive credit for acceptance of responsibility pursuant to Guideline §3E1.1. PSR at ¶43. This is clear in light of defendant's decision to proceed to trial, pursuant to Application Note 2 to Guideline §3E1.1; defendant's statements to Probation, particularly when she expressed that she had not done anything illegal, *see* PSR at ¶43; defendant's statements in the Defendant's Version of the Offense, including her claim that she "is without information as to what effect [ ] her false statements had on the grand jury's ability to understand the dynamic of what was going on, and to what extent her false testimony prevented the government from proceeding without prosecutions; and, defendant's statements in her Sentencing Memorandum, s*ee, e.g.,* Defendant's Sentencing Memorandum at 4-5 (questioning materiality of the lies in the counts of conviction, despite jury's conviction on all three counts which necessitated a materiality finding), at 8 ("While there was not a single jury instruction, which was submitted to the jury, that referenced whether Beena Patel was a public servant, an assistant circuit court clerk or a friend of Dorothy Brown, Beena Patel appreciates

10

and understands that her lies *could* have seriously affected an investigation into public corruption.") (emphasis added).

As a result, it is the government's position that defendant's advisory Guidelines range is 24 to 30 months' imprisonment. For reasons further discussed below, the government seeks a sentence of 30 months' imprisonment.

### III. SENTENCING RECOMMENDATION

The factors set forth in Section 3553(a) support a sentence of 30 months' imprisonment, the high end of the applicable Guidelines range.

**A. The Nature, Circumstances, and Seriousness of the Offense.**

The nature, circumstances, and seriousness of the offense favor a sentence at the high end of the Guidelines range. *See* 18 U.S.C. §§ 3553(a)(1) & (2)(A). The public's expectation that witnesses appearing before a grand jury will testify truthfully is a fundamental lynchpin of federal law enforcement. Witnesses who lie during the course of a grand jury investigation not only violate their solemn oath to tell the truth, but also impede the grand jury's ability to gather evidence.

Here, defendant's lies impacted a significant public corruption investigation into illegal job-buying within the Clerk's Office, and constituted an assault on the truth-finding function of the grand jury in this case and the justice system in general. This Court should send a clear message to anyone, such as the defendant, who seeks to thwart, by lying under oath, the investigation and prosecution of public servants who abuse their positions of trust.

11

**B. Defendant's History and Characteristics.**

The government acknowledges that defendant has no criminal history and has made significant contributions to her community. In addition, defendant has presented letters of support from both family and community members that reflect positively on defendant's character. These letters paint a portrait of a family-minded individual who has given back to her community. The government acknowledges that these are significant factors in mitigation, and does not lightly recommend a high-end guidelines sentence of 30 months' imprisonment in view of that mitigation.

However, the positive attributes detailed in those letters must be considered against the backdrop of a complete picture of defendant's history and characteristics. In contrast to the picture portrayed in her letters of support, the Court must also consider how defendant conducted herself during her tenure as a high-ranking Clerk's Office employee. She lied under oath in two separate appearances before the grand jury in order to prevent the grand jury from learning the truth about illegal bribery and extortion activity within the Clerk's Office. Moreover, defendant was the one who brokered the deal and facilitated the bribe payment while defendant was herself employed at the Clerk's Office and making a six-figure salary. When Rajaram arrived at the Sabre Room with $10,000 of cash in an envelope in order to obtain employment within the Clerk's Office, it was defendant who received that money. When Rajaram sat at a Corner Bakery dining table across the street from the Daley Center and handed over an envelope containing $5,000 of cash in order to secure employment in the Clerk's Office, it was, again, defendant who accepted the envelope

12

full of cash.[5]

Defendant's lies to the grand jury also extended beyond the allegations contained in the indictment. As shown through the transcript excerpts of defendant's testimony which were introduced into evidence at trial (and are attached to the Government's Version of the Offense at Exhibits 1 and 2), along with the audio recordings of defendant's testimony, defendant clearly attempted to obstruct the investigation about a number of topics. For example, when originally asked questions about the meeting at the Corner Bakery at which Rajaram promised to make a $5,000 cash payment in order to receive a job within the Clerk's Office, defendant clearly attempted to mislead the Grand Jury multiple times. It was only after an extended period of questioning that defendant finally admitted that the Corner Bakery

---

[5] As noted above, in August of 2014, Rajaram made payments totaling $15,000, purportedly for the purpose of investing in Goat Masters. Rajaram also testified before the grand jury about these payments on October 1, 2015, two weeks prior to the defendant's first appearance before the same grand jury. Rajaram lied, and was convicted of perjury in case number 15 CR 692; Rajaram pled guilty on April 20, 2016. However, Rajaram did submit to a proffer with the government prior to his indictment in which he admitted that he paid a bribe (in the form of $15,000 to Goat Masters) to receive his job, and that defendant brokered the bribe payment. A copy of the FBI 302 memorializing Rajaram's proffer is attached to the Government's Version of the Offense at Exhibit 3.

An under-seal filing is being simultaneously submitted to the Court with this memorandum which presents confidential information that the Court should be aware of in considering Rajaram's proffer.

The information provided by Rajaram during his proffer is credible for several reasons. At the time of his proffer, Rajaram sought immunity from the government, and therefore had every incentive to provide truthful information. The government did not provide Rajaram with immunity; however, the information Rajaram provided was confirmed by the statements Rajaram and his attorney made at his own sentencing hearing. Rajaram's information was also corroborated through: toll records; forensic evidence obtained from the cell phones of Rajaram, defendant, and the Clerk; historical cell site data; Cook County employment records; Goat Masters' bank records; and, records obtained from Goat Masters, including the two promissory notes introduced at trial.

13

Meeting even took place, or that she was present. When defendant did finally admit her presence, she attempted to minimize her own involvement by stating that Rajaram slid the envelope containing $5,000 in cash directly to the Clerk.[6] By then, her testimony had been so misleading and had contradicted itself in so many respects that it was difficult for the Grand Jury to credit or follow anything that she said. Unfortunately, just as one example, defendant's lies, and others, on this topic successfully derailed the Grand Jury's investigation of this bribe payment.

Ultimately, defendant, a Cook County employee herself, was an active participant in Cook County's seminal problem of "pay-to-play" corruption, and she took active, intentional, and repeated measures to cover up that corruption.

### C. To Afford Adequate Deterrence and to Promote Respect for the Law.

Both Probation and defendant recommend a sentence of probation in this matter. This Court should outright reject that position.

Probation cites to Rajaram's sentence of probation received from Judge Coleman in support of their recommendation in this case that defendant, too, receive a sentence of probation. Sentencing defendant to a high-end guidelines term of imprisonment does not constitute an unwarranted sentencing disparity with respect to Rajaram for a number of reasons. Defendant is a different person from Rajaram, and while they were both convicted of the same offense, the circumstances

---

[6]According to Rajaram's proffer, d*efendant* accepted these cash payments, both when Rajaram made a $10,000 bribe payment at the Sabre Room, and again when he made a $5,000 bribe payment outside the Corner Bakery.

14

surrounding defendant's offense are much more serious.

While the government does not believe it is appropriate to discuss Rajaram's personal attributes in this sentencing paper, the record is clear that Rajaram received a sentence of probation based, in part, upon significant health and mental health issues which would have made a term of imprisonment particularly deleterious for both him and his family.[7] Sentencing Rajaram to a period of incarceration was of serious concern in Rajaram's case in light of the representations made about Rajaram's health, which were credited by the sentencing court.

In addition, different guidelines calculations apply to defendant than applied to Rajaram. In Rajaram's case, the government recommended a guidelines sentence of 15 months' imprisonment from the Court (the range was 15 to 21 months' imprisonment). Probation did not apply, and the government did not seek, application of the enhancement at Guideline §2J1.3(b)(2) for substantial interference with respect to Rajaram.[8] In addition, Rajaram pled guilty. All of these factors lead to defendant having a higher guidelines sentence.

In total, the 3553(a) factors weigh much more heavily in favor of incarceration with respect to defendant than they did with respect to Rajaram. Even though Rajaram's lies impacted the investigation, the fact that he paid a bribe was

---

[7] A copy of the transcript of Rajaram's sentencing hearing is attached as Exhibit 4.

[8] At the time of Rajaram's sentencing in February 2017, it was unclear to the government the full effect of Rajaram's obstruction, particularly because defendant had not yet even been indicted and the question of defendant's ability and willingness to cooperate remained an open question.

documented in promissory notes and corroborated in multiple ways. *See supra* note 5. In contrast, defendant's perjury had a much more significant impact on the investigation. For example, only defendant, who was a highly-placed insider within the Clerk's Office, is aware of the conversations she had with others outside of Rajaram's presence concerning the bribes Rajaram paid to obtain a job in the Clerk's Office. Defendant not only refused to provide this information, but lied in an attempt—a successful attempt—to derail this entire topic of inquiry.

To this day, even after sitting through a trial in which her abundant lies were proven beyond a reasonable doubt, defendant insists that she did nothing wrong and refuses to accept the materiality of her lies and impact of her conduct. While both defendant and Rajaram demonstrated moral ineptness in their repeated lies to the grand jury and willingness to protect others who participated in bribery and extortion, on the spectrum of culpability defendant is much higher, and her higher guidelines calculation accounts for defendant's more culpable role, her decision to not accept responsibility and to proceed to trial, and her ongoing refusal to accept responsibility even *after* her conviction.

In addition to citing to Rajaram's sentence, Probation's additional reasoning for its recommendation of a sentence of probation is inconsistent and illogical. Probation cites on the one hand the seriousness of defendant's crimes and the impact that her obstruction had on the grand jury's investigation into corruption in the Clerk's Office, but on the other states that defendant's lack of criminal history and good deeds in the community warrant a 100% departure from the Guidelines range

16

of 24 to 30 months' imprisonment. Probation, without any basis, also states that such a sentence is not a "slap on the wrist" because defendant is now a convicted felon. Rest assured, even if Probation's curious conclusion that probation is not a slap on the wrist were true with respect to defendant, it most certainly will be seen as a slap on the wrist by the public, and does nothing to promote general deterrence. A sentence of probation will send a message to future witnesses in public corruption cases that it is okay to lie under oath because, even if you get successfully prosecuted, you will still walk free. The bizarre recommendation of the Probation Office, that this Court depart from the Sentencing Guidelines on the most tenuous of grounds—even though the guidelines call for a term of imprisonment of 24 to 30 months—is unfair, unjust, and inconsistent with the very goals that led to the passage of the Sentencing Guidelines by Congress.

      The Guidelines in this case call for the imposition of a term of imprisonment of between 24 to 30 months' imprisonment, and the Court should impose sentence within this range. Of course, as the Court well knows, it has the power to impose a sentence outside this range, unbridled by the Guidelines. But the government submits that a Guidelines sentence is appropriate in this case, and, in particular, that a sentence of 30 months appropriately balances the defendant's significant mitigation against the seriousness of the crime and the other factors this Court must consider under 18 U.S.C. § 3553. The defendant lied on multiple occasions regarding multiple topics under oath before the grand jury in order to protect herself and other public servants who were within the scope of the illegal job-buying investigation. The time

between defendant's two grand jury appearances spanned nine months, and in those nine months, rather than reconsidering her prior lies and coming clean, defendant doubled-down and lied again. Only when confronted multiple times by prosecutors did defendant provide any truthful information, and even then, defendant minimized and provided incomplete information. As demonstrated by her role in Rajaram's bribe payments to obtain a job, defendant was an active participant in Cook County's seminal problem of "pay-to-play" corruption, and took active measures to cover up that corruption. Defendant participated in serious crimes, and her actions have been calculated and deliberate. Moreover, a sentence within the Guidelines range is essential to promote respect for the law and provide just punishment. A sentence below the Guidelines range, while obviously desired by the defendant and beneficial to her interests, would not promote respect for the law; rather, it would merely breed contempt for it, by suggesting that people who choose to ignore the law and lie under oath in public corruption investigations can simply get away with their crimes without facing any substantial punishment.

If, as the Probation Office suggests, allowing the defendant to avoid any term of imprisonment is the appropriate sentence in this case, then why should anyone feel compelled to respect the law? Why should anyone hesitate before lying under oath and obstructing investigations of corrupt elected officials, when all that lies ahead is a possible lecture from the sentencing court before a return to the comfort of one's home and a cozy retirement? In these circumstances, why should extortion and bribery victims and third parties who are forced to work for corrupt elected officials

be expected to respect and uphold the law, and rely on the law and the legal system to deliver just punishment, when those intimately involved in corrupt activity and its cover-up receive a sentence of probation? Will the citizens of Cook County be satisfied upon hearing the Probation Office's explanation that time in prison was ruled out because yes, the defendant lied under oath, prevented the government from bringing charges arising from illegal job-buying and the extortion of low-level employees, but otherwise the defendant led a good life and should therefore not serve prison time? A federal sentence "may not be based on idiosyncratic penological views (such as that the severity of criminal punishment has no significance for the victims of crime, but only for the criminals), disagreement with congressional policy, or weighing criminals' interests more heavily than those of victims and potential victims." *United States v. Goldberg*, 491 F.3d 668, 673-74 (7th Cir. 2007) (collecting cases). The logical conclusion that should be drawn, and which the government urges this Court to draw in this case, is that the Guidelines provide a meaningful benchmark for courts, and a sentence of probation for this defendant will *not* send the appropriate message to the public. A guidelines sentence of 30 months *will* send the appropriate message that there is no place in the criminal justice system for those who lie under oath and obstruct federal investigations in order to protect corrupt public servants. For these reasons, the government submits that a Guideline sentence is appropriate, and the Probation Office's idiosyncratic approach to sentencing in this case should be rejected and a sentence of 30 months' imprisonment should be imposed.

**D. Consideration of supervised release conditions.**

While the PSR provides for conditions of probation, the government seeks that those same conditions be imposed as conditions of supervised release within the Guidelines range of 1 to 3 years. *See* PSR at ¶105. In addition to the mandatory conditions, PSR at ¶ 109 (items 1-3, 7, 9, 10), the government asserts that discretionary conditions are appropriate in this case, as well. *See* PSR at ¶110, 111.

## CONCLUSION

The government seeks a sentence of 30 months' imprisonment. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, protect the public from future crimes of defendant, properly account for defendant's history and characteristics, and ensure a fair and uniform sentence.

Dated: November 12, 2019                    Respectfully submitted,

                                                                 JOHN R. LAUSCH, Jr.
                                                                 United States Attorney

By:   */s/ Heather K. McShain*
       Heather McShain
       Ankur Srivastava
       Assistant United States Attorneys
       United States Attorney's Office
       219 South Dearborn Street
       Chicago, Illinois 60604
       (312) 353-1414